D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
STACEY L. GARCIA,

                        Plaintiff,

                                            **OPINION & ORDER**
    -against-                                   **09-CV-2630**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                        Defendant.
-------------------------------------------------------X
FEUERSTEIN, J.

On June 2, 2009, plaintiff Stacey Garcia ("Plaintiff") commenced this action pursuant to

42 U.S.C. § 1383(c)(3), seeking judicial review of the final determination of defendant

Commissioner of the Social Security Administration ("the Commissioner") that Plaintiff is

ineligible for Supplementary Security Income ("SSI") under the Social Security Act ("SSA").

On August 12, 2010, the Commissioner moved for judgment upon the pleadings pursuant to Fed.

R. Civ. P. 12(c) ("Rule 12(c)"). For the reasons set forth herein, the Commissioner's motion is

granted.

I.      BACKGROUND

      A.     Administrative Proceedings

Plaintiff is a forty-one (41) year old female. See Administrative Record ("Tr.") at 265.

On September 15, 2003, Plaintiff filed an application for SSI, id. at 77-79, 88-97, which was

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
STACEY L. GARCIA,

                             Plaintiff,

    -against-

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                         Defendant.
--------------------------------------------------------X
FEUERSTEIN, J.

**OPINION & ORDER**
**09-CV-2630**

On June 2, 2009, plaintiff Stacey Garcia ("Plaintiff") commenced this action pursuant to

42 U.S.C. § 1383(c)(3), seeking judicial review of the final determination of defendant

Commissioner of the Social Security Administration ("the Commissioner") that Plaintiff is

ineligible for Supplementary Security Income ("SSI") under the Social Security Act ("SSA").

On August 12, 2010, the Commissioner moved for judgment upon the pleadings pursuant to Fed.

R. Civ. P. 12(c) ("Rule 12(c)"). For the reasons set forth herein, the Commissioner's motion is

granted.


I.      BACKGROUND


    A.      Administrative Proceedings


Plaintiff is a forty-one (41) year old female. See Administrative Record ("Tr.") at 265.

On September 15, 2003, Plaintiff filed an application for SSI, id. at 77-79, 88-97, which was

denied on March 9, 2004, id. at 21. Plaintiff requested a hearing, see id. at 24, and on August 18, 2005, appeared with counsel before Administrative Law Judge Seymour Rayner ("the ALJ"), see id. at 264. On September 14, 2005, the ALJ upheld the Commissioner's determination, finding that Plaintiff was able to perform sedentary work despite severe degenerative disc disease, arthritis, carpal tunnel syndrome, fibromyalgia, and asthma. Id. at 43-48. On September 22, 2005, Plaintiff requested a review of the ALJ's decision by the Appeals Council. Id. at 49-51. On February 24, 2006, the Appeals Council remanded the case to the ALJ for further consideration of the opinions of Plaintiff's treating doctors, additional evaluation of Plaintiff's subjective complaints, discussion of Plaintiff's residual functional capacity, and evidence from a vocational expert to clarify the effect of Plaintiff's asserted limitations. Id. at 54-56.

On October 24, 2006, the ALJ held a second hearing. See id. at 281. At that hearing, Dr. Gerald Greenberg testified as a medical expert, see id. at 59, 304, and David Vandergoot ("Vandergoot") testified as a vocational expert, see id. at 65, 320. On November 22, 2006, the ALJ ruled against Plaintiff, finding that Plaintiff had a residual functional capacity to perform work existing in significant numbers in the national economy. Id. at 328-36. Plaintiff timely sought review of this decision by the Appeals Council. See id. at 260-61. On September 8, 2008, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. Id. at 11-14.

B.     Plaintiff's History

1.     Non-Medical History

Between November 1990 and May 1992, Plaintiff was employed as a cashier at Toys "R" Us. Id. at 90. Plaintiff states that she worked seven (7) to eight (8) hours per day and was required to walk for fifteen (15) minutes, stand for eight (8) hours, and sit for fifteen (15) minutes each work day. Id. Among her duties as a cashier, Plaintiff was required to write; frequently lift, carry, and bag ten-pound (10 lb.) objects, and occasionally lift twenty-pound (20 lb.) objects. Id. Between September 1992 until September 1993, Plaintiff was employed at a department store. Id. Plaintiff stopped working in 1993 to take care of her children, who were experiencing chronic illnesses. Id. at 89.

Plaintiff alleges that she first experienced pain in her neck, back, leg, and stomach after falling in January 2001. Id. at 266. At the time of her application, Plaintiff indicated that she had difficulty walking, suffered from constant pain in her back, and spent "all day" in the bathroom. Id. at 89. Plaintiff stated that she was limited in her ability to work by several herniated discs, fibromyalgia, irritable bowel syndrome ("IBS"), carpal tunnel syndrome, osteoarthritis, scoliosis, asthma, acid reflux disease, gastritis, and a sliding hernia, id., and indicated that she takes Prevacid, Celebrex, Flexeril, Zyrtec, Rhinocort, and milk thistle, id. at 94. At the first hearing before the ALJ, on August 18, 2005, Plaintiff testified that she experienced "pain all over . . . going from my neck all the way down to my ankle," id. at 266, back pain every day, id. at 267, neck pain every other day, id., and migraines lasting "about a day" each, id. at 268.

On October 24, 2006, at the second hearing before the ALJ, Plaintiff testified that she had

3

difficulty sitting, walking, and standing, id. at 287; that she could sit for fifteen (15) to twenty (20) minutes, stand for fifteen (15) minutes, walk one (1) block, and lift or carry five (5) to ten (10) pounds, id.; and that she had difficulty breathing three (3) to four (4) times per week, id. at 288. Plaintiff stated that she had pain and numbness in her left hand, id. at 299; that she dropped things with her left hand and had difficulty writing, id. at 286-87; and that her migraines lasted twelve (12) to fifteen (15) hours a day, id. at 288-89.

### 2. Medical History

#### a. History Prior to Plaintiff's September 15, 2003 Application

On January 31, 2001, a magnetic resonance imaging test ("MRI") of Plaintiff's lumbosacral spine revealed prominent annulus at L4-L5 and L5-S1. Id. at 106. An MRI of the cervical spine on the same day showed straightening of the cervical lordosis with a herniated disc at C5-C6. Id. at 107. On February 9, 2001, an MRI of Plaintiff's thoracic spine revealed no abnormalities. Id. at 105.

On April 4, 2001, Dr. Dhiren C. Mehta, a gastroenterologist, noted that Plaintiff's "past medical history is significant only for asthma." Id. at 169. Although Plaintiff reported having four (4) to five (5) bowel movements per day, upon examination Plaintiff's lungs were clear, her abdomen was soft and non-tender, and her bowel sounds were normal. Id. at 169-70. Dr. Mehta assessed a history of gastroesophageal reflux disease, diarrhea, and nonalcoholic steatohepatitis; diagnosed Plaintiff to have an enlarged liver, an enlarged spleen, sharp epigastric pain unrelated to food intake, and irritable bowel syndrome; and advised Plaintiff to have blood tests, an upper

endoscopy, and a colonoscopy in order to rule out Barrett's esophagus and autoimmune hepatitis. Id. at 169-70.

Plaintiff's blood tests, taken on May 10, 2001, did not indicate celiac disease or hepatitis. Id. at 161-63. A colonoscopy taken on May 18, 2001, showed only moderate non-bleeding hemorrhoids. Id. at 166. An esophagogastroduodenoscopy ("EGD") taken on May 22, 2001 showed evidence of Grade I reflux esophagitis, non-erosive gastritis, a moderate sliding hiatal hernia, and a normal duodenum. Id. at 167.

On October 25, 2001, Plaintiff was examined by Dr. Robert Bernard, who noted a sore throat, neck pain, spots in Plaintiff's mouth, and a history of asthma and allergies. Id. at 172.

From April 29 to May 2, 2002, Plaintiff was hospitalized at Central Suffolk Hospital for treatment of a fecal impaction after eating a bag of pumpkin seeds. Id. at 182-86.

On September 23, 2002, an MRI of Plaintiff's lumbrosacral spine showed a herniated posterior disc at L5-S1. Id. at 101.

On February 25, 2003, Dr. John O'Connor treated Plaintiff for an upper respiratory infection and possible urinary tract infection. Id. at 221. At a follow-up visit on March 4, 2003, Dr. O'Connor noted that Plaintiff was "feeling better" but still suffering from "[a]ches" and "[p]ains." Id. at 220.

On March 10, 2003, Plaintiff was admitted to Central Suffolk Hospital, complaining of nausea, vomiting, and diarrhea, id. at 120, and was diagnosed with gastroenteritis, id. at 118. On March 11, 2003, Plaintiff was discharged and instructed to take Tylenol, drink only clear fluids for twenty-four (24) hours, and maintain a diet of bananas, rice, applesauce, and toast. Id. at 125. The following day, Dr. John O'Connor saw Plaintiff, who complained of an upset stomach. Id.

at 220.

On March 17, 2003, Plaintiff complained of right knee pain and swelling. Id. Dr. O'Connor ordered x-rays and prescribed Celebrex. Id. Tests for mononeucleosis and hepatitis B were negative. See id. at 231-32. Tests of Plaintiff's liver revealed normal functioning. Id. at 233-36. On March 21, 2003, Plaintiff called Dr. O'Connor to request further rheumatologic examinations. Id. at 219.

On May 12, 2003, Dr. Ira Chernoff of New York Orthopedic Spinal Associates examined Plaintiff, who claimed to be experiencing neck pain, back pain, chest pain, leg pain; numbness in her legs; and discomfort while walking, standing, and sitting. Id. at 134-35. Dr. Chernoff noted normal reflexes, normal sensation in Plaintiff's arms and legs, full strength in her arms and legs, and an ability to heel-walk and toe-walk. Id. at 135. Plaintiff could bend forward, hyperextend minimally, and bend her chin to one (1) inch of her chest. Id. Dr. Chernoff reviewed Plaintiff's MRI and x-rays and noted that he "did not see very much." Id. He diagnosed Plaintiff to have "[f]ibromyalgia with multiple tender spots including Erb's point," recommended that Plaintiff see a rheumatologist, and noted that Plaintiff "may have Lipoma in the muscles in the back of the right side." Id.

On June 25, 2003, Dr. Chernoff examined Plaintiff again. Id. at 133. Although Plaintiff complained of worsening pain in the neck, back, chest, and leg, she was able to walk. Id. Dr. Chernoff noted that Plaintiff had some nodules in her back and believed Plaintiff to suffer from fibromyalgia with multiple tender spots. Id. He again recommended that Plaintiff see a rheumatologist and advised her to obtain an MRI of the lumbar spine. Id. On June 30, 2003, an MRI of the soft tissue of the back was "essentially unremarkable." Id. at 102. On July 9, 2003,

6

Dr. Chernoff examined the MRI and noted that it "looked fine." Id. at 131. He diagnosed Plaintiff to have fibromyalgia with multiple tender spots and referred her to Dr. Paul Schulman for evaluation. Id. at 131-32.

On September 9, 2003, Plaintiff complained to Dr. O'Connor about pain radiating from her left buttock. Id. at 219. Dr. O'Connor observed gluteal spasms, assessed it to be sciatica, and recommended a physical therapy evaluation. Id. On September 10, 2003, Plaintiff's liver functioning was normal. Id. at 229.

On September 15, 2003, Plaintiff visited Dr. Mehta and complained of abdominal discomfort. Id. at 158-60. Plaintiff stated that she had one (1) to eight (8) bowel movements per day. Id. Plaintiff's neck, heart, lungs, abdomen, and extremities were normal. Id. at 158. Dr. Mehta diagnosed Plaintiff to have diarrhea, irritable bowel syndrome ("IBS"), and fibromyalgia, and he prescribed Imodium. Id. at 160.

In a medical assessment form completed for the New York State Office of Temporary and Disability Assistance and based on his examinations up to September 15, 2003, Dr. Mehta indicated that he first treated Plaintiff on April 4, 2001, id. at 110-13, that he diagnosed Plaintiff with IBS, fibromyalgia, and fatty liver, although diarrhea was her only current symptom, id. at 110, and that Plaintiff was instructed to take Imodium as needed for temporary relief, id. at 111. Dr. Mehta could not assess whether Plaintiff had a significant psychiatric disorder. Id. Although Dr. Mehta stated that Plaintiff had no significant clinical findings, he noted that physical exertion brings on fatigue in Plaintiff thirty (30) minutes after beginning a strenuous activity and requires Plaintiff to rest for one (1) to two (2) hours after the onset of fatigue. Id. at 112. Dr. Mehta stated that he could not provide a medical opinion regarding Plaintiff's ability to do work-related

activities. Id. at 113.

b.  History After Plaintiff's September 15, 2003 Application, Prior to the Commissioner's March 9, 2004 Denial of Benefits

On September 25, 2003, Dr. O'Connor saw Plaintiff, who complained of diarrhea. Id. at 218. Plaintiff stated that she often ate only one (1) meal each day, frequently fast food. Id. On September 29, 2003, an ultrasound showed no evidence of deep vein thrombosis or any sonographic abnormality in Plaintiff's lower extremities. Id. at 100.

On October 8, 2003, Dr. Marc Chernoff performed a physical examination of Plaintiff. Id. at 129-30. Plaintiff had decreased sensation in the left L5 distribution but intact sensation in the S1 distribution. Id. at 129. Plaintiff had "some weakness" in the left hamstrings when compared to the right, but she could heel-walk and toe-walk and perform lumber flexion and extension. Id. Dr. Chernoff diagnosed Plaintiff to have "[l]eft sciatica with S1 radiculopathy on the left side" and ordered an MRI of the lumbar spine. Id. The MRI, taken on October 20, 2003, showed disc herniation at L4-5, possibly in contact with the L5 nerve root, and a hernia at L5-S1, which "may be" impinging on the nerve roots at S1 on the left side. Id. at 114.

On October 29, 2003, Dr. Ira Chernoff examined Plaintiff. Id. at 127. Plaintiff had weakness in the hamstrings but could heel-walk and toe-walk. Id. Dr. Chernoff reviewed the results of the MRI of the lumbar spine and diagnosed "[s]ciatica in the left leg with an S1 radiculopathy." Id. He stated that Plaintiff could have surgery to "decompress the nerve and clean it out" or have an epidural steroid injection. Id.

On November 6, 2003, Dr. Naim Abrar, an endocrinologist, advised Dr. Mehta that he

diagnosed Plaintiff with "morbid obesity" and that she "most likely" had IBS. Id. at 138. Dr. Abrar recommended a change in diet, weight loss, and exercise. Id.

On November 26, 2003, Plaintiff returned to Dr. Ira Chernoff, complaining of pain radiating down her left leg into the calf, which she stated began on August 15, 2003. Id. at 126. Dr. Chernoff diagnosed "sciatica in the left leg with S1 radiculopathy" again, and he recommended surgery or an epidural steroid injection. Id. He prescribed Vioprofen, but noted that Plaintiff's physician "advised against it with the liver." Id.

On January 5, 2004, Dr. Rashid Ayyub, a consultative physician for the Commissioner, performed an orthopedic examination. Id. at 147-50. Plaintiff told Dr. Ayyub that she developed severe pain radiating in the neck down to her arms and "excruciating" pain from the thoracic and lumbosacral area to her legs after her 2001 fall. Id. at 147. Plaintiff, who needed no assistance to walk, told Dr. Ayyub that she spent most of the day reading a newspaper, watching television, and spending time with her children, id. at 147-48, and that she did "very light work" but needed help shopping for groceries and doing laundry, id. at 147.

During Dr. Ayyub's examination, Plaintiff walked with a "normal" gait without an assistive device and walked on her heels and on her toes. Id. at 148. Plaintiff could perform a full squat, rise from a chair without difficulty, and make a fist. Id. Plaintiff's grip strength was four-out-of-five (4/5) in her left hand and five-out-of-five (5/5) in the right hand, her reflexes were normal, she showed no signs of atrophy, and she had full sensation in both hands. Id. Plaintiff had "a lot of tenderness" in her spine, and excess rotation produced "severe pain." Id. at 148-49. Plaintiff had full range of motion in her wrists, elbows, forearms, and shoulders, but she complained of pain and tingling in both arms and in her left hand. Id. at 149. Plaintiff's strength

9

was four-out-of-five (4/5) in her left arm's distal muscles, but was five-out-of-five (5/5) in her right arm's distal muscles. Id. Plaintiff had muscle spasms in the lumbrosacral spine and tender spots on her hips, but her reflexes were normal, and Dr. Ayyub discovered "no atrophy of any muscle." Id. Plaintiff had all senses intact in her lower extremities and no joint effusion or inflammation. Id.

Dr. Ayyub diagnosed Plaintiff to have three (3) herniated discs, bilateral sciatica, spinal stenosis, fibromyalgia, carpal tunnel syndrome of the left hand, bronchial asthma, peptic ulcer disease of the stomach, and status post laparoscopic cholecystectomy. Id. at 150. Dr. Ayyub stated that Plaintiff had "moderate restrictions for prolonged standing and walking with frequent rest in between [,] marked restrictions for heavy lifting and carrying [, and] moderate restriction for activities requiring fine manipulation with the left hand because of involvement of the left hand with carpal tunnel syndrome." Id.

Also on January 5, 2004, Dr. Tasneem Sulaiman, a consultative physician for the Commissioner, conducted an internal examination of Plaintiff. Id. at 143-46. Plaintiff complained of pain in "all the small and large joints" since 2001. Id. at 143. At this examination, Plaintiff used a cane, stating that it was prescribed by her orthopedist. Id. at 144. Plaintiff walked with a bilateral limp and complained of knee pain. Id. Although Plaintiff's stance was normal and she needed no help changing for the examination, she could not walk on her heels or toes, and she could not squat. Id. Dr. Sulaiman noted that Plaintiff needed assistance getting on and off the examination table but could do "all" the activities of daily living. Id.

Upon Dr. Sulaiman's examination, Plaintiff's chest and lungs were normal, her abdomen

had normal bowel sounds, and there were no masses, abdominal bruits, or hepatosplenomegaly. Id. at 145. Although pain restricted Plaintiff's range of motion in the lumbar spine, Plaintiff had full ranges of motion in the cervical spine and thoracic spine. Id. There were six (6) "trigger points."[1] Id. Dr. Sulaiman observed no motor or sensory defect, no signs of muscular atrophy in the arms or legs, and no cyanosis, clubbing, or edema. Id. Plaintiff's pulse was normal, and she had full grip strength in both hands. Id. at 146.

Dr. Sulaiman diagnosed severe osteoarthritis of multiple joints, lower back pain with two herniated discs, spinal senosis, a history of fatty infiltration of the liver with heptomegaly, status post cholecystectomy, a history of peptic ulcer disease, and endometriosis. Id. Dr. Sulaiman stated that Plaintiff had "no difficulty sitting" but "mild difficulty standing and moderate to severe difficulty walking," and her "ability for exertional activities is limited to mild exertion only." Id.

A chest x-ray taken on January 5, 2004, read by Dr. Pesho S. Kotval, showed no active lung disease. Id. at 142. On January 13, 2004, Dr. Kotval noted that x-rays of Plaintiff's left hand were unremarkable, and lumbar spinal x-rays showed straightening of the lordotic curve. Id. at 151.

On February 26, 2004, Plaintiff visited Dr. O'Connor's office. Id. at 217. Dr. O'Connor's notation from the visit, which appears to be in handwriting different from Dr.

_____

[1]Dr. Sulaiman did not specify what "trigger points" he tested on Plaintiff. However, a doctor assessing possible fibromyalgia may test to see if a patient exhibits pain at no fewer than eleven (11) of eighteen (18) "trigger points." See, e.g., Frederick Wolfe et. al., *The American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia: Report of the Multicenter Criteria Committee*, Arthritis & Rheumatism, February 1990, at 160-72.

O'Connor's earlier notes, states that Plaintiff "needs spinal surgery orothpedic - migrane - can twork good" [sic]. Id.

        b.     History After Commissioner's March 9, 2004 Denial of Benefits, Prior to the ALJ's September 15, 2005 Decision

On March 12, 2004, Plaintiff was admitted to the Central Suffolk Hospital emergency room, complaining of shortness of breath. Id. at 191. Plaintiff was diagnosed with a panic attack, but refused medication and was discharged the same day. Id. at 189. On March 13, 2004, Plaintiff returned to the emergency room, complaining of shortness of breath, difficulty sleeping, and a burning sensation in the chest. Id. at 196. After a physical examination and electrocardiogram, Plaintiff was diagnosed with anxiety, but refused Xanax and other medications. Id. at 197-98. Chest x-rays of Plaintiff, read by Dr. Jack Morgani on March 15, 2004, were normal. Id. at 176. On March 18, 2004, Plaintiff told Dr. Bernard that she was experiencing itchiness and thought she was having an allergic reaction to her medications. Id. at 173. Dr. Bernard instructed patient to receive an allergy shot. Id. Plaintiff later complained of right side pain and fatigue. Id. at 175.

On March 27, 2004, Plaintiff was again admitted to the Central Suffolk Hospital emergency room, complaining of a sore throat and gastric pain. Id. at 207. The attending physician noted that Plaintiff stated that her "liver feels swollen/enlarged." Id. Plaintiff had "generalized tenderness" in her abdomen. Id. at 208. A computed tomography ("CT") scan indicated that Plaintiff's liver, spleen, pancreas and kidneys were intact. Id. at 215.

On May 2, 2004, Plaintiff was admitted to the Stony Brook University Hospital

12

emergency room with difficulty swallowing, palpitations, and chest pain. Id. at 248. Examination revealed that Plaintiff had a palpated right thyroid nodule and tenderness to palpation in the epigastrum and right upper quadrant. Id. A chest x-ray and electrocardiogram taken that day were normal. Id. at 225, 250. Plaintiff was diagnosed with hyperthyroidism and told to return to the emergency room if she had trouble breathing, her heart rate increased significantly, or her pain increased. Id. at 249.

On May 26, 2004, a CT scan of Plaintiff's neck was "essentially normal" but for a "cluster of three [3] tiny lymph nodes measuring in total less than a centimeter in diameter." Id. at 254. The cluster was "at the level of the palpable abnormality" and represented a "nonspecific finding." Id.

On January 31, 2005, Plaintiff complained to Dr. Bernard that her heart had been "racing" for four (4) weeks, that she had experienced ear throbbing and heard wave-like sounds, and that she was experiencing pressure in her head. Id. at 256. Dr. Bernard assessed palpitations, eustachian tube dysfunction, and upper respiratory infection, and he recommended a Holter monitor test. Id. On February 2, 2005, Dr. Bernard noted that the Holter monitor test was normal. Id.

On June 27, 2005, Dr. Bellamy Brook wrote a letter on behalf of Plaintiff, addressed "To Whom It May Concern," indicating that Plaintiff was being treated for "multiple medical problems, including chronic asthma, osteoarthritis, IBS, and spinal stenosis." Id. at 255. Dr. Brook stated that Plaintiff required "continuous medical monitoring of these conditions . . . to keep her symptoms under control" and recommended that Plaintiff "get her own living unit on the ground floor level." Id.

13

On July 7, 2005, Plaintiff complained to Dr. Bernard of back pain, painful urination, an asthma attack, and swollen ankles. Id. at 258. Dr. Bernard noted that Plaintiff complained of "too many multiple things . . . all of which 'could' qualify her for disability." Id. Dr. Bernard noted that Plaintiff had never seen an asthma specialist, assessed Plaintiff's back pains, and advised Plaintiff that she must go to Dr. Chernoff for disability forms. Id. After Dr. Bernard indicated that he was unable to complete disability forms for her, Plaintiff stated she wanted to be tested for HIV, Lyme disease, and diabetes. Id. at 259. All tests were negative. Id.

### C.    Expert Testimony

#### 1.    Medical Expert

At the second hearing before the ALJ, on October 24, 2006, Dr. Gerald Greenberg, the medical expert called by the ALJ in accordance with the Appeals Council's decision, testified that the medical record supports Plaintiff's inability to push and pull in excess of five (5) to ten (10) pounds, id. at 317; that Plaintiff's reaching was limited depending upon her "pain at the time," id.; that the record supports "very minimal difficulties" with fine manipulation and dexterity, id.; that there was no medical evidence supporting Plaintiff's claim of asthma, id. at 306-07; and that a pulmonary function study was "essentially normal," id. at 306. Dr. Greenberg testified that the consulting physicians' objective physical findings of January 5, 2004 would not preclude sedentary work. Id. at 314. Dr. Greenberg testified that Plaintiff's pain emanating from the sciatic nerve would not necessarily affect her ability to sit, id. at 313; that the severity of Plaintiff's fibromyalgia and the extent to which her pain limited her ability to work "would be a

14

question of credibility," id. at 307; and that the extent to which Plaintiff's IBS limited her ability to work was dependent upon the severity of her symptoms and was another "credibility issue," id. at 318.

### 2. Vocational Expert

David Vandergoot, the vocational expert called by the ALJ in accordance with the Appeals Council's decision, testified that Plaintiff's skills from the "semiskilled" and "light" position of cashier were transferable. Id. at 321. The ALJ asked Vandergoot to evaluate the employment opportunities for an individual of Plaintiff's age, educational background,[2] and work experience, where such individual could sit for up to six (6) hours, stand or walk for up to two (2) hours, and lift or carry up to ten pounds (10 lbs.) during an eight (8) hour shift. Id. Vandergoot testified that such a person could not perform Plaintiff's past work as she performed it, but there were other jobs existing for such a person, even if the person could not raise her arms over her head or sit for longer than one (1) hour at a time. Id. at 321-22. Vandergoot identified the sedentary, unskilled jobs of order clerk, information clerk, and charge account clerk. Id. at 322. These jobs required limited bilateral manual dexterity, and each had at least seventy-five thousand (75,000) positions nationally. Id. at 322-23. Vandergoot testified that there were approximately twelve thousand (12,000) order clerk positions locally, one thousand five hundred (1,500) information clerk positions locally, and seven hundred (700) charge account clerks locally. Id. Vandergoot testified that most work would be precluded if an individual could not

---

[2]Plaintiff alternatively stated that she had a tenth (10th) grade education, Tr. at 283, and an eleventh (11th) grade education, id. at 95, 265. The ALJ hypothesized "10 [ten] years of schooling." Tr. at 321.

sit for an hour at a time, but that an individual who could sit for one (1) hour continuously could "go from break to break" throughout the work day. Id. at 323. Plaintiff's attorney asked Vandergoot how long an individual with a "moderate restriction for prolonged walking and standing with frequent rests in between" could actually walk or stand. Id. at 323-24. Vandergoot indicated that his answer was not a "scientific conclusion," id. at 323, but that "the person could only probably walk" for fifteen (15) minutes or less, id. at 324.

## II.    DISCUSSION

### A.    Legal Standard

#### 1.    Rule 12(c)

In deciding a Rule 12(c) motion, the same standard as that applicable to a motion under Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)") is applied. Bank of New York v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010). The standard of review on a motion made pursuant to Rule 12(b)(6) is that a plaintiff plead sufficient facts "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The court must "accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co., 517 F.3d 104, 115 (2d Cir. 2008) (citations omitted).

However, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Ashcroft v. Iqbal, ---U.S.---, 129 S. Ct. 1937,

1949, 173 L. Ed. 2d 868 (2009) (quoting Twombly, 550 U.S. at 555, 127 S. Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s]' deviod of 'further factual enhancement.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 557, 127 S. Ct. at 1966). Factual allegations must raise a right to relief above the speculative level "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555, 127 S. Ct. at 1965. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949.

In deciding a Rule 12(c) motion, the court may consider documents possessed by or known to the plaintiff and upon which it relied in bringing the suit. See ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

    2.     Administrative Review

The SSA provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). Although the SSA is a "remedial statute which must be 'liberally applied'" and "its intent is inclusion rather than exclusion," Marcus v. Califano, 615 F.2d 23, 29 (2d Cir. 1979) (citations omitted), the court must affirm the Commissioner's decision if it is supported by substantial evidence, even if the district court might have ruled differently were it to have made the initial determination. Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).

Substantial evidence requires "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971)). The court "consider[s] the record as a whole" in determining whether there is "substantial evidence . . . to support the Commissioner's decision and if the correct legal standards have been applied." Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (citing Shaw, 221 F.3d at 131).

3.    Determining Disability

To qualify for SSI, a claimant must be unable "to engage in any substantial gainful employment by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 [twelve] months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairment is only disabling if she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations prescribe a five (5) step process by which the Commissioner is required to evaluate a claim for disability benefits. Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002). In the first four (4) steps, the claimant bears the burden of proving that he or she is disabled. Shaw, 221 F.3d at 132. The regulations require the Commissioner to determine (1) whether the claimant is working, (2) whether the claimant has a "severe impairment," (3) whether the claimant's impairment is one that conclusively requires a determination of disability,

and (4) whether the claimant is capable of continuing her prior type of work. 20 C.F.R. §
404.1520(b)–(f) (2002); see also Draegert, 311 F.3d at 472. Although a claimant must prove that
her impairment is "severe" in order to establish a disability, not all "severe" impairments
constitute disabilities. E.g., Gladden v. Comm'r of Soc. Sec., 337 F. App'x. 136 (2d Cir. 2009)
(severe physical impairment); Zabala v. Astrue, 595 F.3d 402 (2d Cir. 2010) (severe mental
impairment). However, if the claimant has an impairment that has been listed as conclusively
requiring a determination of disability, the analysis stops at step three (3) and a claimant is
deemed disabled. 20 C.F.R. § 404.1520(d).

If the claimant meets her burdens in each of the first four (4) steps, the Commissioner has
the burden in step five (5) of proving that the claimant nonetheless retains "a residual functional
capacity to perform alternative substantial gainful work which exists in the national economy."
Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). To meet this burden, the Commissioner must
first show that "the claimant's impairment is of a kind that still permits certain types of activity . .
. necessary for other occupations . . . ." Decker v. Harris, 647 F.2d 291, 294 (2d Cir. 1981).
"Second, the Secretary must present evidence showing the existence of specific types of jobs,
available in the national economy, suitable for a claimant with these capabilities and skills." Id.;
see also Dumas v. Schweiker, 712 F.2d 1545, 1551 (2d Cir. 1983).

Social Security regulations require that a "treating physician's report is generally given
more weight than other reports and that a treating physician's opinion will be controlling if it is
well-supported by medically acceptable [evidence] and is not inconsistent with the other
substantial evidence in [the] record." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (internal
quotations omitted). However, a treating physician's opinion is only given controlling weight

19

when it is well-supported on the "nature *and severity*" of the claimant's impairment.  20 C.F.R. § 404.1527(d)(2) (emphasis added).

C.    The ALJ's Decision

Following a hearing, the ALJ found that the claimant has not engaged in substantial gainful employment since filing her application for SSI, id. at 335-36; that the medical evidence establishes that Plaintiff suffered from "severe sciatica, degenerative disc disease, arthritis, left carpal tunnel syndrome, scoliosis, fibromyalgia, peptic ulcer disease, irritable bowel syndrome and asthma," id. at 336; that none of the impairments meet in severity the clinical criteria of any *per se* listing disability, id.; and that although Plaintiff could not perform her past work, she could perform other work available in the national economy, id.

Based upon the observations of Plaintiff's treating physicians and other objective medical evidence from the record, the ALJ reviewed Plaintiff's limitations stemming from her asthma, fibromyalgia, reflux disease, nonerosive gastritis, IBS, herniated discs, carpal tunnel syndrome, osteoarthritis, and scolosis, and analyzed how the combination of these impairments might affect Plaintiff's ability to work.  Id. at 334-35.  The ALJ based his analysis of the severity of Plaintiff's impairments upon the reports of treating physicians Drs. Chernoff and Mehta and consultative examining physician Dr. Ayyub.  Id.

Although the ALJ found Plaintiff had "some neck and back pain, left arm/hand pain and weakness and joint and muscle pain and aches resulting in some limitation of daily activities," he concluded that "[t]he medical record does not contain evidence of markedly severe exertional limitations that preclude performance of all substantial gainful activity," and that Plaintiff's

20

subjective allegations of the severity of her symptoms were not supported by the evidence of record and were not fully credible. Id. The ALJ found that Plaintiff has a residual functional capacity ("RFC") of "a full range of sedentary work," which entails sitting for six (6) hours, standing and walking for two (2) hours, occasionally lifting objects under ten (10) pounds, and working with restrictions on manipulation, reaching, pushing, and pulling; and that although Plaintiff does not have the RFC to perform her past relevant work, she was not disabled pursuant to the SSA because her RFC allows her to perform other work existing in significant numbers in the national economy. Id. at 336.

D.      Plaintiff's Argument

Plaintiff has not opposed the Commissioner's motion to dismiss. Because a district court must "make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training," Traguth v. Zuck, 710 F.2d 90, 95 (2d Cir. 1983), the Court will examine Plaintiff's strongest arguments: (1) that there was not substantial evidence to support the ALJ's finding that Plaintiff's testimony about the effect of her IBS was "not fully credible," (2) that there was not substantial evidence to support the ALJ's finding that Plaintiff's testimony of her pain symptoms was not credible, and (3) that there was not substantial evidence to support the ALJ's decision that her multiple severe impairments in combination do not qualify her for SSI.

1.      Effect of Irritable Bowel Syndrome

When a claimant has a "medically determinable" physical impairment "that could

21

reasonably be expected to produce the symptoms" the claimant alleges, the ALJ must set forth "specific reasons" and "evidence in the case record" for finding the claimant's allegations not credible. Social Security Ruling 96-7p, 1996 WL 374186, ¶ 5 (July 2, 1996). "[S]tatements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." Id.

The ALJ found that, although Plaintiff suffered from severe IBS, there was no evidence that it prevented Plaintiff from performing sedentary work. Tr. at 336. When describing Plaintiff's statements about her IBS, the ALJ noted her inconsistent claims. Id. at 330. At different times, Plaintiff complained of four (4) to five (5) bowel movements a day, id. at 169, one (1) to eight (8) bowel movements a day, id. at 158, and nine (9) to ten (10) bowel movements a day, id. at 318. Despite a voluminous medical history, the record includes no statements by any of Plaintiff's many doctors indicating any medical opinions regarding the extent of or limitations caused by Plaintiff's IBS; the record includes only Plaintiff's significantly varying claims of its symptoms. The ALJ also noted that Plaintiff had gone more than a year without seeing a doctor for her symptoms, id. at 335, despite the fact that she had insurance and saw doctors for other issues, id. at 291.

The ALJ's specific reasons for rejecting Plaintiff's characterization of the severity of her IBS are supported by substantial evidence in the record.

2.    Pain Symptoms from Plaintiff's Fibromyalgia Diagnosis

Fibromyalgia is a disabling impairment for which there are no objective tests to confirm the disease. See Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (citing Preston v.

Sec. of Health and Human Servs., 854 F.2d 815, 818 (6th Cir. 1988)).  Fibromyalgia is characterized by "chronic pain of musculoskeletal origin but uncertain cause." STEDMAN'S MEDICAL DICTIONARY 671 (27th ed. 2000).  In the context of SSI claims, "[s]ubjective *pain* may serve as the basis for establishing disability, even if [. . .] unaccompanied by positive clinical findings of other 'objective' medical evidence." Donato v. Sec. of Dep't of Health and Human Servs., 721 F.2d 414, 418-19 (2d Cir. 1983) (emphasis in original) (citing Marcus, 615 F.2d at 27).  However, "mere diagnosis of fibromyalgia without a finding as to the severity of symptoms and limitations does not mandate a finding of disability." Rivers v. Astrue, 280 F. App'x. 20, 22 (2d Cir. 2008) (summary order) (citing Green-Younger, 335 F.3d at 104).  An ALJ is not required to credit a claimant's testimony about "the severity of her pain and the functional limitations it caused." Rivers, 280 F. App'x. at 22.  "[T]here must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment . . . which could reasonably be expected to produce the pain or other symptoms alleged and which . . . would lead to a conclusion that the individual is under a disability." 42 U.S.C. § 423(d)(5)(A).  "Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings." Snell, 177 F.3d at 135 (citing Donato, 721 F.2d at 418-19).

Although the ALJ may not reject a claimant's "statements about the intensity and persistence of [her] pain . . . solely because the available objective medical evidence does not substantiate [the claimant's] statements," 20 C.F.R. § 404.1529(c)(2), information from the claimant's physicians and a claimant's statements of her daily routine that are inconsistent with the claimant's testimony about the severity of her pain may serve as the basis for deeming the

23

testimony as not credible. See Rivers, 280 F. App'x. at 23. The ALJ may use doctors' notations in support of such findings. See Brunson v. Barnhart, No. 01-CV-1829, 2002 WL 393078, at *18 (E.D.N.Y. Mar. 14, 2002) (instructing the ALJ to consider doctors' separate observations that claimant was in "no acute distress," had only "mild" pain, and had complaints of pain that "seem[ed] out of proportion").

The ALJ credited Plaintiff's treating physicians' diagnoses of fibromyalgia and accepted Dr. Greenberg's assessment of Plaintiff's ten (10) pound lifting limitation. Tr. at 335-36. The ALJ also credited Drs. Ayyub and Sulaiman's reports, noting that Plaintiff could only walk or stand for two (2) hours in an eight (8) hour shift, id., and relied upon Vandergoot's testimony that a sedentary worker who could not sit for longer than an hour at a time would be able to go from break to break during the work day, id. at 323. The ALJ also used information from the treating physicians when questioning Dr. Greenberg. Id. at 316-17.

The ALJ found that Plaintiff's "subjective allegations" were "not supported by the evidence of record" and "therefore not fully credible." Id. at 336. The ALJ based this determination upon Plaintiff's testimony that she bathes independently, washes dishes, shops with assistance, and performs light work at home, id. at 335, and noted that Plaintiff did not see a doctor for any of her relevant impairments for a year prior to the hearing, id., while the record demonstrates she had insurance during that time, id. at 291. The ALJ noted that Dr. Chernoff reported that Plaintiff had only "some weakness" in the left hamstrings but had full strength in her upper and lower extremities, id. at 334., that Dr. Ayyub observed Plaintiff get on and off the examination table without assistance, id., and that Dr. Mehta and Dr. Bernard were unable to provide a medical opinion regarding Plaintiff's ability to do work-related activities, id. at 113,

24

258-59.

The record includes no medical opinions suggesting limitations that would prevent sedentary work. See id. at 150 (Dr. Ayyub noting "moderate" restrictions for "prolonged" standing and walking); id. at 146 (Dr. Sulaiman allowing plaintiff to continue "mild exertion"). In contrast, Dr. Bernard's noted that Plaintiff complained of "too many multiple things . . . all of which 'could' qualify her for disability." Id. at 258. Furthermore, the ALJ found that "[t]here are inconsistencies in the record with regard to the claimant's activities and limitations . . . ." Id. at 334. Plaintiff appeared at different doctor appointments on the same day presenting different conditions. Compare id. at 143 (presenting to Dr. Sulaiman with a bilateral limp and using a cane) with id. at 148 (walking normally before Dr. Ayyub with no assistive device).

The ALJ noted that the "medical record does not contain evidence of markedly severe exertional limitations that preclude performance of all substantial gainful activity," id., and no treating doctor had opined that Plaintiff was disabled or could not do work within the sedentary residual functioning capacity, id. at 335. The ALJ's determination of the credibility of Plaintiff's claim is supported by substantial evidence.

### 3. Multiple Severe Impairments

An ALJ must consider a claimant's multiple impairments in combination when determining disability. Dixon v. Shalala, 54 F.3d 1019, 1031 (2d Cir. 1995). However, a claimant with multiple severe impairments is not automatically entitled to SSI. See Shiver v. Apfel, 21 F. Supp. 2d 192 (E.D.N.Y. 1998) (affirming an ALJ's determination that a claimant with multiple severe impairments retained a sedentary residual functioning capacity); see also

<u>Santiago v. Comm'r of Soc. Sec.</u>, No. 08-CV-2443, 2010 WL 5313539 (E.D.N.Y. Dec. 20, 2010) (affirming an ALJ's decision that a claimant with multiple severe impairments retained a capacity to perform her past work as a cashier); <u>Munoz v. Barnhart</u>, No. 02-CV-5084, 2003 WL 22170598 (E.D.N.Y. July 25, 2003) (affirming a denial of benefits where claimant retained a residual functioning capacity to perform light work despite impairments that were severe in combination).

The ALJ specifically indicated that he considered Plaintiff's severe impairments in relevant combinations. Tr. at 334. As noted above, none of Plaintiff's treating physicians expressed opinions indicating Plaintiff was precluded from performing sedentary work by the cumulative effect of her impairments. The determination that Plaintiff retains the ability to perform sedentary work is supported by substantial evidence.

III.     Conclusion

For the reasons stated above, the motion of the Commissioner to dismiss the Petition pursuant to Rule 12(c) is granted. The Clerk of the Court is directed to close the case.

SO ORDERED.

_____
Sandra J. Feuerstein
United States District Judge

Dated: July 22, 2011
          Central Islip, New York